IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00084-STV

VANESSA PETERSON,

    Plaintiff,

v.

THE SALVATION ARMY,

    Defendants.

_____

**ORDER**
_____

Chief United States Magistrate Judge Scott T. Varholak

    This matter comes before the Court on Defendant's First Motion to Compel Arbitration (the "Motion"). [#13] The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [##14, 18] This Court has carefully considered the Motion and related briefing, the entire case file, the applicable case law, and oral argument conducted on April 1, 2025. [#24] For the following reasons, the Motion is **GRANTED**.

**I.    BACKGROUND**

    Plaintiff is diagnosed with Leber Congenital Amaurosis ("LCA") and is legally blind. [#7 at ¶ 7] In September 2007, Plaintiff began employment with Defendant Salvation Army as a Gift Planning Administrative Assistant in Kansas City, Missouri. [*Id.* at ¶ 31] For approximately fifteen years, Defendant provided Plaintiff with reasonable accommodations in her Gift Planning Administrative Assistant position. [*Id.* at ¶ 33]

On January 20, 2023, Defendant's Division Development Director Peter Irwin contacted Plaintiff about interviewing for the Donor Services Associate position in Denver, Colorado. [*Id.* at ¶ 34] Six days later, Defendant offered Plaintiff the Donor Services Associate position. [*Id.* at ¶ 35] Before accepting the position, Plaintiff asked whether she would receive the same accommodations that she had received in Kansas City and was assured that she would receive those accommodations. [*Id.* at ¶¶ 36-39] Relying upon these assurances, on February 6, 2023, Plaintiff accepted the position and moved to Denver five weeks later. [*Id.* at ¶¶ 41-42]

It is undisputed that on March 24, 2023, Plaintiff and her husband, who is not blind, met with Kelli Licata, an Assistant Human Resources Director for Defendant, at Ms. Licata's home. [##13-2 at ¶¶ 1, 13; 21-1 at ¶ 7; 21-2 at ¶ 3] The purpose of the meeting was to allow Plaintiff to sign various onboarding documents prior to beginning her new position. [##13-2 at ¶ 15; 21-1 at ¶ 7; 21-2 at ¶ 3] Ms. Licata has attested that she provided Plaintiff copies of the onboarding documents prior to the March 24 meeting and that Plaintiff signed the documents prior to the meeting. [#13-2 at ¶ 10] Plaintiff, on the other hand, attests that she received the documents for the first time during the March 24 meeting and she signed them in Ms. Licata's dining room. [#21-1 at ¶¶ 15-16] Plaintiff further attests that she thought the onboarding documents included items such as tax forms and emergency contact information, and that during the meeting she clarified the number of hours she would be working and that she was declining Defendant's insurance coverage. [*Id.* at ¶¶ 14, 20]

Part of the onboarding packet was a Mutual Arbitration Agreement (the "Arbitration Agreement"). [##13-1; 13-2 at ¶¶ 5, 17] The five-page Arbitration Agreement states in

2

bold lettering at the beginning that: "All disputes covered by this Agreement shall be decided by an arbitrator through arbitration and not by way of court or jury trial." [#13-1 at 2]  Above the signature line, in bold, all-capital lettering, it states:

> I acknowledge that I have carefully read and understand this Agreement and agree to its terms.  I agree that through this Agreement, the Company and I are giving up our rights to a court or jury trial and that pursuant to this Agreement, we are agreeing to arbitrate claims and disputes covered by this Agreement.

[#13-1 at 6]  The Arbitration Agreement contains Plaintiff's signature.

Plaintiff does not dispute signing the Arbitration Agreement.  [#21-1 at ¶ 21]  But, she attests that she does not recall having any discussion with Ms. Licata about the Arbitration Agreement or the consequences of signing it.  [*Id.* at ¶¶ 16, 18]  She further attests that she "was not given the opportunity to review the arbitration agreement" at home with her screen reader prior to signing the Arbitration Agreement.  [*Id.* at ¶ 17]  Plaintiff also attests that Ms. Licata told Plaintiff that she would receive copies of the signed onboarding documents but she never received them.  [*Id.* at ¶ 22]  Plaintiff's husband has submitted an affidavit supporting Plaintiff's recollection of the March 24 meeting.  [#21-2]

On March 27, 2023, Plaintiff commenced her Donor Services Associate role.  [#7 at ¶ 44]  Despite its previous assurances, Plaintiff alleges that Defendant did not provide Plaintiff with the requested accommodations.  [*Id.* at ¶ 45]  Plaintiff further alleges that the work environment was toxic.  [*Id.* at ¶¶ 73-77]  As a result, on May 4, 2023, Plaintiff informed Defendant of her resignation.  [*Id.* at ¶ 49]  Defendant and Plaintiff discussed Plaintiff going on paid administrative leave instead of resigning and Plaintiff agreed.  [*Id.* at ¶¶ 78, 80]  Plaintiff alleges, however, that she continued to face discriminatory

3

treatment and a lack of accommodations and, as a result, on June 29, 2023, she submitted her resignation. [*Id.* at ¶¶ 84-90]

On December 16, 2024, Plaintiff initiated this action in the District Court for Denver County. [#7] The Complaint brings seven claims for relief, all pursuant to state law. [*Id.*] On January 10, 2025, Defendant removed this action based upon diversity jurisdiction. [#1] And on January 17, 2025, Defendant filed the instant Motion seeking an Order compelling Plaintiff to submit her claims to binding arbitration. [#13] Plaintiff has responded to the Motion [#21] and Defendant replied [#22]. On April 1, 2025, this Court heard oral argument on the Motion and took the matter under advisement. [#24]

## II.   STANDARD OF REVIEW

Arbitration agreements are governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. § 1 *et seq*. But "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedone Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). "[U]nlike the general presumption that a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1370 (D. Colo. 2014) ("*Nesbitt I*") (quoting *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998)), *aff'd*, 811 F.3d 371 (10th Cir. 2016) ("*Nesbitt II*"); *see also Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) (stating that the "presumption [of arbitrability] disappears when the parties dispute the existence of a valid arbitration agreement"). "A federal court must apply state contract law principles when determining whether an arbitration agreement is valid and

enforceable." *Nesbitt I*, 74 F. Supp. 3d at 1371 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

If the court determines the existence of a valid and enforceable arbitration agreement, the FAA then applies.  Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *see also Nesbitt I*, 74 F. Supp. 3d at 1370 (same).  Accordingly, the FAA requires the Court to "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds*, 470 U.S. at 221, unless the agreement to arbitrate is invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," *Nesbitt II*, 811 F.3d at 376 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 507 (2018).  But an arbitration agreement will not be nullified by "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  *Id.*

In considering a motion to compel arbitration under the FAA, the court applies "a standard similar to that governing motions for summary judgment."  *Stein v. Burt-Kuni One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005); *see also Ragab v. Howard*, 841 F.3d 1134, 1139 (10th Cir. 2016) ("When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties

actually agreed to arbitrate," applying a "standard [that] is similar to the summary judgment standard."). Accordingly, a defendant "must present evidence sufficient to demonstrate an enforceable arbitration agreement." *Stein*, 396 F. Supp. 2d at 1213. Then, the burden shifts to plaintiffs "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *Id.* If that occurs, "then a trial on the existence of the arbitration agreement is required." *Id.*

### III.  ANALYSIS

In its Motion, Defendant argues that Plaintiff's claims are subject to the Arbitration Agreement. [#13] Defendant has provided the Arbitration Agreement that contains Plaintiff's signature dated March 24, 2023. [#13-1] Plaintiff's response does not dispute signing the arbitration Agreement. [##21; 21-1 at ¶ 21] The Court thus finds that Defendant has satisfied its burden of establishing the existence of an arbitration agreement.

The burden thus shifts to Plaintiff "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1148 (D. Colo. 2012) (*Vernon I*) (quotation omitted). Plaintiff has failed to do so. Plaintiff acknowledges that she would have been able to review the document at home, with the assistance of her Job Access with Speech screen reader. [#21-1 at ¶¶ 2, 17] Yet she has not alleged that Ms. Licata prevented Plaintiff from taking the documents home prior to signing them, that Ms. Licata demanded the documents be signed on the spot, or that Plaintiff requested additional time to review the documents and Ms. Licata refused that request. Similarly,

Plaintiff's husband attests that the "pile of documentation that Ms. Licata provided to [Plaintiff] was very large and would have taken hours for me to read and comprehend" [#21-2 at ¶ 8], yet he does not attest that he or Plaintiff requested additional time to review the documentation or that Ms. Licata refused any such request.  Rather, Plaintiff simply chose to sign the documents on the spot without taking them home and reading them.  And the fact that Plaintiff did not ask for the opportunity to take the documents she was signing home before signing them does not make the Arbitration Agreement invalid or unconscionable.  *See Vernon v. Qwest Commc'ns Int'l, Inc.*, 925 F. Supp. 2d 1185, 1191 (D. Colo. 2013) (*Vernon II*) ("[I]f one chooses to 'sign' a contract and to accept its benefits without reading and understanding its terms, he generally must accept the consequences of his decision."); *Axis Venture Grp., LLC v. 1111 Tower, LLC*, No. 09–cv–01636–PAB–KMT, 2010 WL 1278306, at *4-5 (D. Colo. Mar. 20, 2010) (finding that plaintiff attempted to imply that he was "affirmatively instructed to sign the documents without reading them," but that the record showed that he was provided access to the agreement, was not prevented from reading the agreement, was not compelled or defrauded, did not ask for additional time to read, and he "did not concern himself" with the specific terms of the agreement); *Dumais v. Am. Golf Corp*, 150 F. Supp. 2d 1182, 1191 (D.N.M. 2001) (granting motion to compel arbitration despite Plaintiff's arguments that she was not a native English speaker, not given an explanation of the agreement, and not given time to review the agreement, because "a party who executes a written contract with another is presumed to know the terms of the agreement").

This would be a very different case if Plaintiff presented evidence that she asked for additional time to review the agreements and Ms. Licata refused.  In such a situation,

Plaintiff could argue that she did not know what she was signing and did not have the ability to apprise herself of what she was signing. But Plaintiff has not made any such assertions. Instead, she merely asserts that she signed the Arbitration Agreement on the spot, despite her inability to read it. That is a choice she made and she is bound by the consequences.[1]

This would also be a different case if Plaintiff alleged that Ms. Licata misrepresented the nature of what she was asking Plaintiff to sign. But Plaintiff makes no such allegations. She says it "was [her] understanding" that she was signing onboarding documents such as tax forms and emergency contact information [#21-1 at ¶ 14], but she does not provide the basis for that understanding and certainly does not allege that Ms. Licata told Plaintiff she was signing something other than an Arbitration Agreement when Plaintiff signed that document. And, once again, "if one chooses to 'sign' a contract and to accept its benefits without reading and understanding its terms, he generally must accept the consequences of his decision."[2] *Vernon II*, 925 F. Supp. 2d at 1191."

---

[1] Plaintiff does assert that she was "informed by Ms. Licata that [Plaintiff] would receive copies of the signed and executed onboarding documentation for [her] records," but she never received such documents. [#21-1 at ¶ 22] But this assertion is beside the point—once she signed the documents she agreed to their terms. She does not allege that she requested the documents before signing and Ms. Licata refused to provide them or give Plaintiff an opportunity to review the documents.

[2] Plaintiff's argument that the Arbitration Agreement should be rescinded on the basis of mistake [#21 at 10-12] fails for the same reason. *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 563 (Colo. App. 2004) ("[W]here a party's unilateral mistake is the result not of fraud, but of its own failure to use due diligence in reading the contract before signing it, that party will be held to the terms of the contract.").

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendant's First Motion to Compel Arbitration [#13] and **STAYS** this matter pending arbitration.  *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("staying rather than dismissing a suit comports with the supervisory role that the FAA envisions for the courts").  The parties shall file a status report within seven days of the completion of arbitration.

DATED:  July 16, 2025                              BY THE COURT:

                                                                    s/Scott T. Varholak
                                                                    Chief United States Magistrate Judge